**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JULIE BEBERMAN,<br>*Plaintiff*,<br>v.<br>MARCO RUBIO,<br>*Defendant*. | Civil Action No. 25-1181 (TJK) |

**MEMORANDUM OPINION & ORDER**

Julie Beberman had a limited appointment as a Foreign Service career candidate for about four years, and stuck around at the State Department for more than nine. And by now, she has spent more years suing the Department than she did working for it. Her roughly nine-year employment has yielded more than a decade's worth of administrative challenges and federal lawsuits. At points, Beberman has notched some narrow wins. For example, after she was deferred and denied tenure by three tenure boards at the end of her trial period, Beberman successfully argued in an administrative appeal that the tenure boards were improperly constituted. So the Department directed three reconstituted boards to consider her for tenure afresh. But the new boards came to the same conclusion as the old ones: no tenure for Beberman.

This suit takes aim at the reconstituted boards, both directly and indirectly. In a two-count complaint, Beberman challenges the processes used by the reconstituted boards and alleges that their decisions were the products of retaliation and discrimination against her. The State Department moves to dismiss for failure to state a claim. The result is mixed. The Court agrees that Beberman fails to state a claim for one count. But the Department does not carry its burden for the other, and so that part of this chapter of Beberman's saga will continue.

## I. Background

The U.S. Foreign Service is a branch of the Department of State. *See Shea v. Kerry*, 796 F.3d 42, 46 (D.C. Cir. 2015). Foreign Service Officers "perform traditional diplomatic responsibilities, including trade promotion, political and economic reporting, and consular services and protection." *Id.* (cleaned up). The Foreign Service uses a tenure system. Untenured candidates receive a "limited appointment" that typically "may not exceed 5 years." 22 U.S.C. § 3949(a). When that trial period ends, the candidate either receives tenure or is "separated from the Foreign Service." 3 FAM 2216.2-1(c). The tenure review process occurs during the limited appointment and is run by the Commissioning and Tenure Board ("the Board"). 3 FAM 2245.1; *see* 3 FAM 2241.4. A candidate who flunks the Board's "initial" review can receive up to two more tenure reviews. *See* 3 FAM 2245.2(a).

Beberman started work at the State Department in early 2010 and began her limited appointment as a Foreign Service Officer candidate in March 2011. *See* ECF No. 13 ¶¶ 18, 23–24. Her first stop as a career candidate was in Caracas. *Id.* ¶ 25. There, she was assigned to the nonimmigrant visa unit. *Id.* ¶ 26. Her first-level supervisor was Deputy Visa Chief Shane Myers. *Id.* ¶ 27. As Beberman tells it, things between her and Myers went downhill. Beberman alleges that she experienced "pain . . . when . . . using the keyboard that the Department provided to other employees" and "sought a reasonable accommodation from the Department's disability office to use an ergonomic keyboard." *Id.* ¶¶ 154–55. But "Myers refused to accommodate [her] need to use an ergonomic keyboard by allowing her to work at the same consular window"—instead requiring her to "retrieve the ergonomic keyboard from her desk" and re-attach it to a different workstation each day. *Id.* ¶¶ 158–59. She describes an incident when she forgot to detach the ergonomic keyboard at the end of the workday and "Myers admonished and humiliated her." *Id.* ¶ 161.

According to Beberman, the first Employee Evaluation Report ("2011 EER") that Myers gave her in Caracas was "negative." ECF No. 13 ¶ 9. Beberman attributes the negative EER—at least in part—to the time that she lost from detaching and re-attaching her ergonomic keyboard at different windows each morning, which "caus[ed] her to lose even more time adjudicating visas." *Id.* ¶ 165.

In August 2012, Visa Chief Eric Cohan became Beberman's rater in Caracas. ECF No. 13 ¶ 30. As Beberman tells it, Cohan treated her in an "unduly harsh and improper fashion" and made repeated "negative comments" about her in a later Employee Evaluation Report ("2012 EER"). *Id.* ¶¶ 9, 221–22. Beberman says that Cohan tried to give "as negative an impression of [her] performance as possible" in her 2012 EER. *Id.* ¶ 248. And she alleges that Cohan ultimately "forc[ed] her to leave Embassy Caracas" before "complet[ing] her assignment" which led her to be "assigned to a two-year position in Washington," rather than going to another overseas posting as originally planned. *Id.* ¶¶ 254–55.

In Beberman's account, Myers and Cohan's dim view of her followed her to Visa Office in Washington. She alleges that one of her co-workers at her job in Washington, David Franz—who worked remotely from Caracas—"conferred regularly with Embassy Caracas consular management including Myers [and] Cohan . . . and was influenced by them." ECF No. 13 ¶ 274. As she describes it, Franz eventually "draft[ed] a memorandum to Human Resources[] calling for disciplinary action against her" and told members of the "Visa Office" "negative things about [her]." *Id.* ¶¶ 279, 285–86. Beberman claims that, as a result, the Visa Office found that she had committed "VLA violations" which resulted in Beberman being given a "one-day disciplinary suspension." *Id.* ¶¶ 290, 293.

Next up for Beberman was a position as an "EEO Counselor" in the Bureau of African Affairs. ECF No. 13 ¶ 297. EEO—Equal Employment Opportunity—Counselors handle administrative complaints about discrimination, retaliation, and hostile work environment. *See Ashhab-Jones v. Pompeo*, No. 1:19-cv-02729 (CJN), 2021 WL 6805645, at *2 (D.D.C. Mar. 30, 2021). Beberman alleges that trouble began once she disclosed to a "Responsible Management Official" that had "previously prevailed" in an EEO matter of her own. ECF No. 13 ¶ 301. She alleges that she was later accused of "being biased against the State Department" and removed from the EEO Counselor Program. *Id.* ¶¶ 318, 322–23.

Beberman alleges that she was next "selected through the competitive bidding process to serve as Political/Economic Officer and to serve as backup Consular Officer" in Equatorial Guinea. *See* ECF No. 13 ¶ 350, 357. But around the time that she was set to head to Africa, Beberman was "engaged in mediation with the State Department of several pending EEO complaints." *Id.* ¶ 359. And after she refused a settlement offer and Myers—her Caracas boss—contacted other officials at the Department, a State Department office "decided to deny Beberman the opportunity to serve as backup consular officer" in Equatorial Guinea. *Id.* ¶¶ 376; *see id.* ¶¶ 369–71.

The tenure review process played out on a parallel track. The tenure Board reviewing Beberman's time in the Foreign Service first "deferred" her tenure in 2014. ECF No. 13 ¶ 46. In 2015, a later Board came to the same conclusion, and a third board 'denied' her tenue later that year. *Id.*

But all that was just the beginning. Beberman states that after she "proved to the satisfaction of the Foreign Service Grievance Board [that these CTBs] were not properly constituted," the Grievance Board ordered reconstituted CTBs to consider her for tenure again in 2022. ECF No.

13 ¶¶ 47–48. But the second try produced the same results: Beberman was not granted tenure. *Id.* ¶¶ 50, 55–56.

This lawsuit is not Beberman's first. By Defendant's count, it is one of eighteen lawsuits Beberman has filed since 2014 about her State Department service. *See* ECF No. 14 at 8.[1] Some have substantial overlap with this lawsuit. *See e.g.*, *Beberman v. U.S. Dep't of State*, No. CV 14-0020, 2018 WL 1998307 (D.V.I. Apr. 27, 2018); *Beberman v. U.S. State Dep't*, No. CV 17-48, 2018 WL 3795226 (D.V.I. Aug. 9, 2018), *aff'd on other grounds sub nom. Beberman v. Sec'y U.S. Dep't of State*, No. 19-2745, 2022 WL 2037944 (3d Cir. June 7, 2022).

In the latest installment of these chronicles, Beberman sues over the reconstituted tenure boards. Beberman sued in April 2024, and after Defendant moved to dismiss, she filed her Amended Complaint in October 2025. *See* ECF Nos. 1, 11, 13.[2] In the Amended Complaint, Beberman brings two counts. Count I alleges that the State Department retaliated against her "with respect to the processes used when it directed properly composed Commissioning and Tenure Boards (CTBs) to consider her for tenure." ECF No. 13 ¶ 8. Count II alleges that Beberman "was

---

[1] *See Beberman v. Dep't of State,* No. 14-cv-0020 (D.V.I.); *Beberman v. U.S. Dep't of State*, No. 16-cv-0062 (D.V.I.); *Beberman v. U.S. Dep't of State,* No.16-cv-0063 (D.V.I.); *Beberman v. United States*, No.16-cv-1006 (Fed. Cl.); *Beberman v. Kerry*, No. 16-cv-02361 (TJK) (D.D.C.); *Beberman v. Dep't of State*, No. 17-cv-0048 (D.V.I.); *Beberman v. Tillerson*, No. 17-cv-00061 (D.V.I.); *Beberman v. United States*, No. 17-cv-0179 (Fed. Cl.); *Beberman v. U.S. Dep't of State*, No. 19-cv-03115 (TJK) (D.D.C.); *Beberman v. Pompeo*, No. 20-cv-00001 (D.V.I.); *Beberman v. Pompeo*, No. 20-cv-00873 (TJK) (D.D.C); *Beberman v. Blinken*, No. 21-cv-03082 (TJK) (D.D.C.); *Beberman v. Rubio*, No. 22-cv-00144 (TJK) (D.D.C.); *Beberman v. Blinken*, No. 22-cv-03434 (TJK) (D.D.C.); *Beberman v. Blinken*, No. 23-cv-00686 (TJK); (D.D.C.); *Beberman v. Blinken*, No. 23-cv-0036 (D.V.I); *Beberman v. Rubio*, No. 24-cv-01710 (TJK) (D.D.C.); *Beberman v. Rubio*, 25-cv-0041 (D.V.I.).

[2] The Court will deny as moot Defendant's first Motion to Dismiss because it was filed before Beberman's Amended Complaint. *See* ECF Nos. 11, 13; *Menoken v. Miles*, 270 F. Supp. 3d 200, 204 n.2 (D.D.C. 2017).

discriminated and retaliated against[,] proximately causing the CTBs to defer and deny her tenure under a cat's paw theory." *Id.* ¶ 9. The Department moves to dismiss both counts for failure to state a claim. *See* ECF No. 14.

## II. Legal Standards

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff states a facially plausible claim when he pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts as true "all well-pleaded factual allegations" and "construes reasonable inferences from those allegations in the plaintiff's favor." *Sissel v. HHS*, 760 F.3d 1, 4 (D.C. Cir. 2014). But "mere conclusory statements" are not enough to establish a plausible claim, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). At the motion-to-dismiss stage, the party moving for dismissal bears the burden of showing that no plausible claim for relief exists. *See Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 48 (D.D.C. 2020).

## III. Analysis

For the reasons explained below, Count I fails to state a plausible claim under any of Beberman's theories, but Count II squeaks by on at least one theory. So the Court will grant in part and deny in part Defendant's motion.

### A. Count I Fails to State a Claim for Relief

Count I is focused on the procedures used by the reconstituted tenure Boards. Beberman alleges that State Department retaliated against her because of a prior administrative complaint she filed against the Department. ECF No. 13 ¶ 63–64. As Beberman describes it, the Department

carried out its retaliation through the procedures used by the reconstituted Boards. *Id.* ¶ 8. Count I is a 92-paragraph behemoth. *See id.* ¶¶ 43–135. At bottom, it alleges that five procedures used by the tenure Boards were retaliatory. Because Beberman does not state a plausible claim for retaliation under any of the five, the Court will grant Defendant's motion to dismiss as to Count I.

Beberman does not pin down the law under which she purports to bring Count I. At points in her Amended Complaint, she invokes the Rehabilitation Act of 1973, 29 U.S.C. §§ 791 *et seq.*, the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621–34, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*[3] But for situations like this, when a plaintiff offers only "circumstantial evidence" of retaliation, the D.C. Circuit uses substantially the same test to determine whether a plaintiff states a prima facie retaliation case under all three. *See Pauling v. D.C.*, 286 F. Supp. 3d 179, 202, 206 (D.D.C. 2017); *see also Tomasello v. Rubin*, 167 F.3d 612, 619 (D.C. Cir. 1999) ("[T]he test for determining retaliation under the ADEA and Title VII is identical."); *compare Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013), *with Ho v. Garland*, 106 F.4th 47, 51 (D.C. Cir. 2024).

That test has three elements. A plaintiff must allege: (1) that "she engaged in statutorily protected activity"; (2) that "she suffered a materially adverse action by her employer"; and (3) that a "causal link connects" the engagement in the "statutorily protected activity" with the "materially adverse action." *Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014). All Beberman's claims about the various procedures used by the tenure Boards fail the second element—material adversity.

Beberman's first theory is that the Department retaliated against her "by deliberately

[3] Defendant does not challenge the Amended Complaint on the grounds that it violates Federal Rule of Civil Procedure 8, so the Court will not raise that issue on its own. *See Solomon v. Vilsack*, 763 F.3d 1, 13 (D.C. Cir. 2014).

stretching out the period of time over which the reconstituted CTBs met." ECF No. 13 ¶ 64. But Beberman does not plausibly allege that the delays were "materially adverse." *Solomon*, 763 F.3d at 14.[4] To evaluate whether an alleged action is "materially adverse," the court assumes the perspective of a "*reasonable* employee" and asks whether the action "*might have*" "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (emphasis added). The point of the "*material* adversity" standard is "to separate significant from trivial harms." *Id.* For purposes of a retaliation claim, "typically, a materially adverse action in the workplace involves 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Bridgeforth*, 721 F.3d at 663. And for alleged harms to be materially adverse, "they must not be unduly speculative." *Id.* (cleaned up).

The D.C. Circuit has held, for example, that a failure to nominate an employee for an award is not materially adverse because the plaintiff "could not show a 'direct tie between a nomination and an award'" and because the award "was discretionary." *Bridgeforth*, 721 F.3d at 663–64 (quoting and characterizing *Douglas v. Donovan*, 559 F.3d 549, 553 (D.C. Cir. 2009)). In that case, "[e]ven if [the plaintiff] had been nominated . . . there were too many intervening factors in the selection process to render his receipt of the award likely." *Bridgeforth*, 721 F.3d at 664..

[4] As Beberman notes in her opposition, the Supreme Court has held that discrimination plaintiffs "need show only some injury respecting her employment terms or conditions. The [action] must have left [plaintiff] worse off, but need not have left her significantly so." *Muldrow v. City of St. Louis*, 601 U.S. 346, 359 (2024); *see* ECF No. 16 at 27–28; *Van Horn v. Del Toro*, No. 23-5169, 2024 WL 4381186, at *2–3 (D.C. Cir. Oct. 3, 2024). But *Muldrow* did not change the standard for retaliation claims. *See Muldrow*, 601 U.S. at 357; *Van Horn*, 2024 WL 4381186, at *3.

Similarly, Beberman identifies two different "unduly speculative" harms from the alleged delay. *Bridgeforth*, 721 F.3d at 663. She argues that the delay was materially adverse because "if she were granted tenure, she would have less time to serve before being required to retire at the mandatory retirement age of 65." ECF No. 13 ¶ 64. But there's one problem: she wasn't granted tenure. *See id.* ¶ 9; ECF No. 14 at 39. So that theory has been overtaken by events. ECF No. 13 ¶ 64; *cf. Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009).

Next, she tries a different chain of inferences. She argues that even if the Boards denied her tenure (again)—which they did—the delay still "reduced the amount of time that [she] would have to challenge an adverse tenure decision and potentially prevail and be reinstated before she reached the age of mandatory retirement." ECF No. 13 ¶ 65. But here the conclusion that the Department's action—the delay—could lead to the alleged tangible harm—reducing the time for possible reinstatement—is "unduly speculative." *Bridgeforth*, 721 F.3d at 663. The "path" from challenging an adverse tenure decision to "potentially prevail[ing]" is "a labyrinth" that is "fraught with 'inherent uncertainty.'" *Id.* at 664; ECF No. 13 ¶ 65; *cf. Beberman v. Blinken*, No. CV 23-686 (TJK), 2024 WL 4332070, at *6 (D.D.C. Sept. 27, 2024), *aff'd sub nom. Beberman v. Rubio*, No. 24-5266, 2025 WL 2792557 (D.C. Cir. Sept. 30, 2025). That attenuated relationship between alleged action and claimed harm does not make the cut to state a plausible claim for a "materially adverse action." *Solomon*, 763 F.3d at 14.

Beberman pushes back, armed with several cases, but none are binding on the Court or even persuasive. One does not even analyze whether a "delayed return to work" amounts to a "materially adverse action." ECF No. 16 at 30; *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 271–72, 277 (2d Cir. 2023). And another, from a different court in this district, leaves open the possibility that a "delay in personnel actions may qualify as adverse actions," but rejects the delay in

that case as a "trivial harm[] that do[es] not qualify as materially adverse." *Jimenez v. Wolf*, No. 19-cv-2055 (CRC), 2020 WL 13546497, at *10 (D.D.C. Sept. 29, 2020). So too here.[5]

Beberman's second theory is that the Department retaliated against her because it did "not requir[e] the reconstituted CTBs to provide [her] with the reasons for their decisions, despite her requesting that the Department provide her with their reasons." ECF No. 13 ¶ 67. Again, she fails to plausibly allege a "materially adverse action." *Bridgeforth*, 721 F.3d at 663. The Amended Complaint does not allege how Beberman was harmed by the tenure Board's failure to provide her with its reasons other than that she "request[ed] that the Department provide her with their reasons." ECF No. 13 ¶ 67. But there is no "requirement that [Boards] provide reasoning." ECF No. 13 ¶ 72; *see Beberman v. Rubio*, No. 22-cv-0144 (TJK), 2025 WL 894262, at *5 (D.D.C. Mar. 24, 2025). And under this Circuit's precedent, merely that the Board didn't do what Beberman wanted just isn't enough; and any downstream residual harm is either speculative or "trivial." *Burlington*, 548 U.S. at 69.

Up next is Beberman's third theory: she alleges that the Department retaliated against her by not instructing the reconstituted Boards to consider her performance between November 2015 and October 2019. ECF No. 13 ¶ 73. As she tells it, "given her strong performance history," the 2015-2019 performance information "would greatly increase the chances of her being granted tenure." *Id.* ¶ 79. But again, this theory is "unduly speculative." *Bridgeforth*, 721 F.3d at 663. Failure to include this information is not itself an "objectively tangible harm" that is "akin to 'firing' or 'a significant change in benefits.'" *Id.* And it is "quite uncertain" whether the post-2015

[5] To the extent that Beberman tries to recast Count I as *both* a discrimination and a retaliation claim, she improperly attempts to "amend her complaint by the briefs in opposition to a motion to dismiss." *Middlebrooks v. Godwin Corp.*, 722 F. Supp. 2d 82, 87 n.4 (D.D.C. 2010); *see* ECF No. 16 at 44–48. Beberman alleges in the Amended Complaint that Count I is a retaliation—not a discrimination—claim. *See* ECF No. 13 ¶¶ 8, 64, 67, 73, 84, 95, 112.

information would make any difference in the ultimate tenure determination. *Douglas*, 559 F.3d at 553; *see Bain v. Off. of Att'y Gen.*, 648 F. Supp. 3d 19, 57 (D.D.C. 2022). An "increase[d] . . . chance" of "being granted tenure" or an opportunity for the Board "to more accurately determine whether [Beberman] met the sole criterion for being granted tenure" are not enough to state a claim. ECF No. 13 ¶ 79, ECF No. 16 at 48.

Beberman's fourth theory fails for a similar reason. She alleges that the Department retaliated against her by directing the reconstituted Boards to consider "the Training Evaluation Report (TER) she received in 2010 and the EER she received as a Foreign Service Specialist career candidate when she served as a Security Engineering Officer." ECF No. 13 ¶ 84. But it is also "quite uncertain" whether excluding that information would have made a difference in the ultimate tenure determination. *Douglas*, 559 F.3d at 553. Thus, this too fails as "unduly speculative." *Bridgeforth*, 721 F.3d at 663; *see* ECF No. 14 at 42–43.

No more plausible is Beberman's fifth theory, which alleges that the Department took several steps that deprived her of the opportunity to "preserve her anonymity." ECF No. 13 ¶ 114. She identifies several steps taken by the Department that she says did so. She keys in first on the selection of "[im]proper companion files" for the Board's review of her candidacy—this apparently allowed the Board to "single her out." *Id.* ¶ 96. But again, any theory of "material[] advers[ity]" rests on guesswork: that the allegedly improper comparator group allowed the Board to "single her out" *and* that deanonymization "resulted in" her tenure denial. *Id.*; *Bridgeforth*, 721 F.3d at 664. Both contingencies are "quite uncertain." *Douglas*, 559 F.3d at 553. Beberman also invokes the inclusion of "erroneous dates on her [2012] EER," which somehow impeded her ability to "preserve her anonymity." ECF No. 13 ¶¶ 112, 114. But the Amended Complaint offers little insight into how "erroneous dates" could lead to difficulties in "preserv[ing] her anonymity," so

this argument is even more "unduly speculative" than her first. *Id.*; *Bridgeforth*, 721 F.3d at 663.[6]

For all these reasons, Count I fails to state a claim, and so the Court will dismiss it.

**B. Count II States a Plausible Claim for Relief**

Count II has many more moving pieces, and it relates to the decision-making of the reconstituted Boards. *See* ECF No. 13 ¶ 9. It alleges that Defendant is liable through a so-called "cat's paw theory." *Id.*

The cat's paw theory comes from an Aesop fable: the cat tricks the monkey into burning its paw on a fire while grabbing a chestnut, then the cat makes off with the chestnut. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011). It was "injected into United States employment discrimination law by Judge Posner in 1990." *Id.* The idea is that "[t]he actions of a discriminatory supervisor that feed into and causally influence the decisionmaker's ultimate determination may also be the proximate cause of an adverse employment action." *Steele v. Mattis*, 899 F.3d 943, 950 (D.C. Cir. 2018). The theory also applies to the actions of a retaliatory supervisor. *See Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016) (collecting cases). Under a cat's paw theory, "a formal decision maker may be an unwitting conduit of another actor's illicit motives." *Walker v. Johnson*, 798 F.3d 1085, 1095 (D.C. Cir. 2015). Put in the terms of the fable, "[a] person motivated by proscribed bias, who has decisive input into an adverse employment action, is the monkey behind the paw of the ultimate decisionmaker that does the deed." *Steele*, 899 F.3d at 951 n.4.

[6] To the extent that Beberman also purports to bring a cat's paw claim based on procedural issues related to the reconstituted Boards, the Court will construe that allegation as falling under Count II, where Beberman makes the rest of her cat's paw theories. *See* ECF No. 13 ¶ 126; *cf. Weaver v. United States*, 98 F.3d 518, 520 (10th Cir. 1996) ("We examine the substance of these allegations, rather than the plaintiff's labels, to determine their true nature.").

Leveraging that theory, Beberman alleges that many actors at the Department—her Embassy Caracas supervisors, a Foreign Service officer working remotely from Caracas, the Office of Civil Rights, and State Department mediation representative, and more—were monkeys behind the burning paws of the reconstituted Boards. ECF No. 13 ¶ 9. The Amended Complaint alleges five different alleged acts of retaliation or discrimination that "proximately caus[ed] the CTBs to defer and deny her tenure under a cat's paw theory." *Id.* Because Defendant cannot carry its burden to dismiss one of Beberman's cat's paw theories, the Court denies its motion to dismiss as to Count II.

Defendant identifies clear defects with most of Beberman's cat's paw theories, but her fifth—and final—theory keeps Count II alive. That theory focuses the Department's alleged about-face on letting Beberman serve as a "backup Consular Officer" in Equatorial Guinea. ECF No. 13 ¶¶ 350–91. It takes a circuitous route. As Beberman tells it, she successfully bid for a "backup Consular Officer" position, but after she turned down a settlement offer to resolve her "several pending EEO complaints," the Department's mediation representative——whom Beberman had also accused of having a conflict of interest—contacted a senior official in the Department's Africa bureau. *Id.* ¶¶ 350, 359. That led to Beberman's "backup Consular Officer" job being cancelled, which caused her tenure review file to lack information about "her performance as a consular officer" in Equatorial Guinea, which meant that "the only EERs which evaluated her on her consular performance were those from Embassy Caracas." *Id.* ¶ 384. And *that* meant that Beberman would not be able to "show[] sufficient improvement to be granted tenure," which "proximately caused the reconstituted CTBs to defer and deny Ms. Beberman tenure." ECF No. 13 ¶¶ 385–89.

Defendant attacks this theory mainly on preclusion grounds. The hook for this argument is one of the many Beberman cases from the Virgin Islands. *See Beberman*, 2018 WL 1998307 (D.V.I. Apr. 27, 2018); ECF No. 14 at 29–32. There, the Court dismissed Beberman's claim that "she was discriminatorily and retaliatory denied an opportunity to serve as a backup consular officer at Embassy Malabo, after the Bureau of Consular Affairs allegedly received unfavorable communications regarding her pending mediation and litigation with the State Department." *Beberman*, 2018 WL 1998307, at *8.

To dispose of the Beberman's "backup Consular Officer" theory, Defendant tries both claim preclusion and issue preclusion.

Issue preclusion means that "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992) (quoting *Allen v. McCurry*, 449 U.S. 90, 94, (1980)). There are three elements to issue preclusion: (1) "the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case"; (2) "the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case"; and (3) "preclusion in the second case must not work a basic unfairness to the party bound by the first determination." *Yamaha Corp.*, 961 F.2d at 254.

Defendant points to a Virgin Islands case to argue that Beberman has already had a "full and fair opportunity . . . to argue that serving as a backup consular officer was an adverse employment action." ECF No. 14 at 31 (citing *Beberman*, 2018 WL 1998307, at *9). There, the court dismissed a retaliation claim, holding that Beberman had not alleged that the denial of the opportunity to serve as backup Consular Officer was an adverse employment action. *Beberman*, 2018

WL 1998307, at *8–9. As the Court described it, Beberman did not allege "any information" to "assess the effect of the denial on her employment record" and "it is neither the Court's responsibility nor obligation to assume speculative facts in Support of Plaintiff's claims."[7] *Id.* at *9. In other words, Beberman's retaliation claim failed because she had not alleged material adversity. *Id.* (quoting *Bridgeforth*, 721 F.3d at 663).[8]

The problem is that the current case does not involve the "same issue" as the earlier case. *Yamaha Corp.*, 961 F.2d at 254. Courts consider a range of factors in determining whether an issue is the same for the purposes of issue preclusion, including "overlap between evidence and argument to be advanced, application of the same rule of law, and relation between claims involved." *Stanton v. D.C. Ct. of App.*, 127 F.3d 72, 78 (D.C. Cir. 1997). As for the second factor, "[i]ssues are not identical if the second action involves application of a different legal standard." *North v. Walsh*, 881 F.2d 1088, 1095 (D.C. Cir. 1989) (R.B. Ginsburg, J.) (quoting 18 Wright & Miller, Fed. Prac. & Proc. Juris. § 4417).

The Court's analysis centers on that second factor. The "rule of law" applied in the Virgin Islands cases was whether the denial of the backup Consular Officer position was itself an "adverse employment action." *Beberman*, 2018 WL 1998307, at *9; *Beberman*, 2018 WL 3795226, at *5.[9]

[7] The court also rejected an age-discrimination theory brought by Beberman because she did not "demonstrate that her age was the reason she was denied th[e] opportunity" to serve as "backup consular officer." *Beberman*, 2018 WL 1998307, at *9. But this does not appear to feature in Defendant's current preclusion argument.

[8] Defendant also directs the Court to another Virgin Islands case, in which the court invoked its earlier Beberman ruling that "the adverse effect of losing this opportunity was too speculative to qualify as an adverse action by the employer," and observed that, for a different Beberman claim, "[t]he analysis holds." ECF No. 14 at 31–32 (citing *Beberman*, 2018 WL 3795226, at *4 ).

[9] As discussed in a different footnote, the Supreme Court has since changed the test to state an employment discrimination claim. *See Muldrow*, 601 U.S. at 357–58. But the Virgin Islands

But contrary to Defendant's representation, that is not the "issue" here. *Yamaha Corp.*, 961 F.2d at 254. To prevail on her cat's paw theory Beberman need not show "that serving as a backup consular officer was an adverse employment action." ECF No. 14 at 31. Instead, there are three elements to a successful cat's paw theory: (1) a "supervisor performs an act motivated by [discriminatory or retaliatory] animus"; (2) that act "is intended by the supervisor to cause an adverse employment action"; and (3) "that act is a proximate cause of the ultimate employment action." *Staub*, 562 U.S. at 422 (emphasis removed). Nowhere does that require showing that the act motivated by animus was itself an "adverse employment action"—just that it was "intended" to cause one and that it was, at some later date, a "proximate cause of the ultimate employment action." *Id.*

That difference also suggests subtle differences in the "evidence and argument to be advanced." *Stanton*, 127 F.3d at 78. To state a claim that the backup Consular Officer denial was an "adverse employment action" Beberman would need to show that the denial was itself "a significant change in employment status," an action "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Sala v. Hawk*, 481 F. App'x 729, 732 (3d Cir. 2012) (cleaned up); *see Beberman*, 2018 WL 1998307, at *9. That inquiry considers questions like whether there were any "discretionary" acts intervening between the discriminatory or retaliatory act and any "objectively tangible harm." *Bridgeforth*, 721 F.3d at 663–64 (cleaned up); *see Beberman*, 2018 WL 1998307, at *9 (citing *Bridgeforth* for the proposition that alleged harms "must not be 'unduly speculative'"). But a cat's paw plaintiff usually can readily concede that a "decisionmaker's exercise of judgment"—a "discretionary" act—was also a "proximate cause of the employment decision." *Staub*, 562 U.S. at 419–20; *Bridgeforth*, 721 F.3d

---

cases relevant here pre-date *Muldrow*, and reflect the law at the time. *See Beberman*, 2018 WL 1998307, at *8; *Beberman*, 2018 WL 3795226, at *5.

at 664. The cat's paw plaintiff only need to show that "actions of a discriminatory supervisor" ultimately "feed into and causally influence the decisionmaker's ultimate determination" and are a "proximate cause of an adverse employment action." *Steele*, 899 F.3d at 950. That question was not "contested by the parties and submitted for judicial determination in the prior case" and "actually and necessarily determined by a court of competent jurisdiction in that prior case." *Yamaha Corp.*, 961 F.2d at 254.

In its reply, Defendant tries to broaden the aperture of the "issue." It argues that in rejecting Beberman's claim that the backup Consular Officer denial was an adverse employment action, "the District of the Virgin Islands . . . determined that Plaintiff failed to show that her tenure would be affected by removal of the consular duties." ECF No. 18 at 11–12. But even if the Virgin Islands Court did determine something along those lines, Defendant appears to concede that this was not the exact issue "actually litigated and necessarily decided." *Id.* at 12. That issue was instead "whether losing the consular duties was an adverse action." *Id.* But as discussed above, that is a different question than the one presented by Beberman's cat's paw theory. Moreover, the Virgin Islands court noted that "Defendant did not move the Court" on the basis of whether "serving as a back-up consular . . . bore on her tenure denial." *Beberman*¸ 2018 WL 3795226, at *5. So the Virgin Islands court did not resolve the issue that is now "contested by the parties." *Yamaha Corp.*¸961 F.2d at 254.

Claim preclusion is Defendant's second bite at the apple. It bars a claim if there has been "prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction." *Nat. Res. Def. Council v. EPA*, 513 F.3d 257, 260 (D.C. Cir. 2008) (cleaned up).

Defendant fails to satisfy the first element. Whether two suits are based on the same claim "turns on whether they share the same nucleus of fact." *Nat. Res. Def. Council*, 513 F.3d at 261 (cleaned up). Two claims do not share a common nucleus of fact where, for example, when "many of the central events underlying" the later case "had not even taken place at the time when [the plaintiff] instigated" the earlier case. *Drake v. F.A.A.*, 291 F.3d 59, 66 (D.C. Cir. 2002). As the D.C. Circuit has put it, claim preclusion does not "preclude claims based on facts not yet in existence at the time of the original action." *Id.* That describes the relationship between Beberman's cat's paw claim and the earlier Virgin Islands lawsuit. Her cat's paw claim is "based" in part on the claim that the "retaliatory and discriminatory change to Beberman's Embassy Malabo assignment . . . proximately caused the reconstituted CTBs not to recommend [her] for tenure." ECF No. 13 ¶ 387. But the reconstituted Boards did not convene until 2020, and so their decision to deny her tenure is a fact that was "not in existence" at the time of her Virgin Islands lawsuit, which began in the mid-2010s. *Drake.*, 291 F.3d at 66; *see* ECF No. 13 ¶ 59; *Beberman*, 2018 WL 1998307, at *1.

For all these reasons, neither issue nor claim preclusion bars the fifth cat's paw theory. After a decade of lawsuits, the Julie A. Beberman corpus of law is no doubt extensive. But it is not yet so extensive as to serve as an all-purpose preclusion tool.

Finally, at one point, Defendant also argues that the Court should dismiss Beberman's claims as "duplicative." ECF No. 14 at 37–38. As Defendant describes things, some of Beberman's cat's paw claims are "materially identical to claims pleaded" in an earlier Beberman lawsuit "except that these claims are based on the reconstituted Tenure Boards' deferrals and denials of tenure rather than the original Tenure Board's action." *Id.*; *see Beberman v. Kerry*, No. 16-cv-02361 ("*Beberman* 2016"), ECF No. 69. That earlier lawsuit has a pending motion to dismiss that,

among other things, seeks to dismiss a discrimination and retaliation claim about the "deci[sion] to deny Beberman the opportunity to serve as backup consular officer." *Beberman* 2016, ECF No. 69 ¶ 234; *id.*, ECF No. 79-1 at 26–27. But this takes too broad a view of "duplicative." True, courts in this District have held that "[w]here a plaintiff brings duplicative claims against the same defendant," the court may "dismiss the claims in the new case as duplicative of the already-pending claims." *Bowe-Connor v. McDonald*, No. 15-cv-0269 (KBJ), 2015 WL 807537, at *1 (D.D.C. Feb. 25, 2015) (cleaned up). But "[d]uplicative claims are those that stem from identical allegations, that are decided under identical legal standards, and for which identical relief is available." *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 81 (D.D.C. 2010). As discussed above, cat's paw claims have a different "legal standard[]." *Id.* And Beberman's claim based on a cat's paw theory cannot stem from "identical allegations" as an amended complaint filed in 2019, because it depends on allegations about the reconstituted Boards that post-date 2019. *Id.*; *cf. id.* (holding that a "secondary-liability claim" is not "duplicative" of a "primary-liability claim").

Defendant does not flesh out any other arguments about why the backup Consular Officer cat's paw theory fails to state a claim. And at this stage, Defendant bears the burden of showing that no plausible claim for relief exists. *See Ctr. for Biological Diversity*, 453 F. Supp. 3d at 48. On this record, this theory gets Beberman over the 12(b)(6) line. Indeed, a claim can make it past the motion-to-dismiss stage even if the court "harbor[s] grave doubts that it would be able to prevail" on the merits. *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 284 (D.C. Cir. 2000) (citation omitted). Count II, the cat's paw Count, survives for now. *See FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 60 (D.D.C. 2022).

## IV. Conclusion and Order

For all the above reasons, it is hereby **ORDERED** that Defendant's Motion to Dismiss, ECF No. 13, is **GRANTED IN PART and DENIED IN PART**. It is further **ORDERED** that

Count I of the Amended Complaint is **DISMISSED**.

**SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 15, 2026